**In re M/V DG HARMONY and Consolidated Cases.**

**No. 98 Civ. 8394(DC).**

United States District Court,
S.D. New York.

Oct. 18, 2005.

Hill Rivkins & Hayden LLP by Anthony J. Pruzinsky, Esq., Daniel J. McInerney, Esq., New York City, for Cargo Plaintiffs.

Freehill, Hogan & Mahar, LLP by Peter J. Gutowski, Esq., Wayne D. Meehan, Esq., Gina M. Venezia, Esq., Michael Fernandez, Esq., New York City, for Vessel Owners.

Piper Rudnick LLP by Stanley McDermott III, Esq., Camilio Cardozo, Esq., New York City, The O'Neil Group by William E. O'Neil, Jr., Esq., Tracy J. Hayes, Esq., New Orleans, LA, Winston & Strawn by Lawrence I. Kiern, Esq., Washington, DC, for PPG Industries, Inc.

Badiak Will & Ruddy LLP by James P. Krauzlis, Esq., Bigham Englar Jones & Houston by Robert J. Phillips, Esq., Kennedy Lillis Schmidt & English by Craig S. English, Esq., New York City, Jadhav & Associates by Rajnikant D. Jadhav, Esq., Dobbs Ferry, NY, for other Counsel.

## OPINION

CHIN, District Judge.

On November 9, 1998, the M/V DG HARMONY was off the coast of Brazil, en route from Miami. At approximately 7:20 a.m., the vessel shuddered. Within moments, dense smoke covered the ship. The master of the vessel, Captain Michael Balitzki, rushed to the bridge. After checking the wind, he turned the ship starboard. The wind cleared the smoke from the deck, and he saw flames coming from cargo hold 3.

The chief officer, who had the watch, had already sounded a general alarm and alerted the crew to assemble. The crew began fighting the fire, wearing fire suits and using hoses and pumps. The crew continued to fight the fire until late afternoon, when the captain ordered most of the crew to abandon ship. A lifeboat was launched at 6 p.m., carrying away fourteen crew members and leaving only the captain and a handful of others behind. As the fourteen crew members looked back from the lifeboat, they saw the HARMONY ablaze, with flames and smoke rising high from approximately the middle third of the ship. One of the crew members took a photograph:

(CX 110 at 1).[1]

The captain and the others who remained aboard the HARMONY continued to fight the fire and operate the vessel. They finally abandoned ship at 2 a.m., after yet another explosion, when the captain decided that it was no longer safe to remain on board. The vessel had been on fire for more than eighteen hours, and portions of her deck and side shell plating had turned red and white hot. The captain collected the vessel's log books and charts, and he and the remaining crew members evacuated, transferring from the HARMONY via a lifeboat to the SEA-LAND URUGUAY, a northbound container ship that had been standing by approximately half a mile away.

The DG HARMONY continued to burn for three weeks. Most of its cargo was destroyed or damaged. The vessel itself was declared a constructive total loss and eventually was scrapped.

Some eighteen lawsuits were filed in this Court, by cargo, vessel, and other interests seeking recovery for damages suffered as a result of the casualty. All claims have been settled except for the claims of certain cargo and vessel interests[2] against defendant PPG Industries, Inc. ("PPG"), the manufacturer of calcium hypochlorite hydrated ("cal-hypo"), a bactericide used to purify water. Ten of the containers aboard the HARMONY contained 120 drums each of cal-hypo, manufactured and shipped by PPG.

Plaintiffs contend that the cal-hypo in one (if not two) of the containers decomposed and self-heated, resulting in "thermal runaway," an explosion, and the fire

---

1. "CX" refers to joint exhibits marked and received as court exhibits. "PX," "OX," and "DX" refer to, respectively, cargo plaintiffs' exhibits, owners' exhibits, and defendant's exhibits. "Tr." refers to the trial transcript.

2. The vessel owners are defendants and cross-claimants in these consolidated actions, but as their interests are now aligned with the plaintiff cargo interests, for convenience I will generally refer to the cargo interests and the owner interests together as "plaintiffs."

that followed. Plaintiffs assert theories of strict liability, breach of warranty, failure to warn, and negligence, and proceed under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304, general maritime law, and New York law, as incorporated by general admiralty principles.

PPG denies liability, arguing that plaintiffs are unable to prove the origin and cause of the fire and that it is impossible to determine where the fire started. PPG also argues that its cal-hypo was not defective, it had no duty to warn, and, even assuming such a duty existed, the duty was not breached. PPG further argues that even if the fire did originate in the containers of cal-hypo, the crew failed to properly stow the cargo because it recklessly placed the containers of cal-hypo next to a source of heat—heated fuel oil bunkers. Finally, PPG argues that the crew was negligent in its efforts to fight the fire.

The case was bifurcated and the issue of liability was tried to the Court, without a jury, from April 22 through May 18, 2004. The parties also submitted extensive deposition excerpts. My findings of fact and conclusions of law follow.

### THE FACTS

#### A. The Casualty

##### 1. The Vessel

The DG HARMONY was a full container ship built as the HANSA CLIPPER in West Germany in 1989. (DX 40 at 5; *see* Tr. 101, 197). The HARMONY was one of a series of sister vessels. (DX 40 at 5). It had an overall length of 176.57 meters and a breadth of 27.5 meters. (*Id.* at 4).

The vessel had three holds with numbered bays using odd numbers from forward to aft as follows:

| | |
|---|---|
| Hold 1 | Bays 1–7 |
| Hold 2 | Bays 9–23 |
| Hold 3 | Bays 25–39 |

(*Id.* at 12; Tr. 256; CX 31). The vessel could hold the equivalent of 1,799 twenty-foot containers. (DX 40 at 12).[3] Hold 3 had twelve hatch covers (or "pontoons"), each 40 feet long and 25 feet wide and weighing 22 tons. (Tr. 246–47, 290).

Containers were placed into the vessel in "slots," running lengthwise aft to forward. Each odd-numbered bay could hold a twenty-foot container in each slot. A forty-foot container could be placed across two slots and the combination of the two bays would be referred to by the corresponding even number.[4] Rows of slots continued across the breadth of the vessel. Containers could be stacked under deck up to the top of the hold, just below the hatch covers. Each layer in the stack was referred to as a "tier." Hence, each slot could be identified by a series of three numbers indicating the bay, the row, and the tier.[5] Containers could also be stacked on deck, on top of the hatch covers, as many as six or seven containers high. (Tr. 289–90, 315–16, 379; *see* CX 92).

All three holds were ventilated by electric fans and were designed to carry dangerous goods. All three holds had $CO_2$ extinguishing systems, and hold 1 had a water sprinkler system as well. (DX 40 at

---

3. Containers are either twenty or forty feet long. They are approximately eight feet high and eight feet wide. (Tr. 296, 418, 800–01, 946).

4. For example, if a forty-foot container were placed in bays 25 and 27, the combined bay would be referred to as bay 26. (Tr. 379–80).

5. Hence, slot 270802 was located in bay 27, row 8, tier 2. On the port side, even numbers were used for the rows and tiers.

13; Tr. 201–02). Each hold also had a smoke detection system that would, upon detecting smoke, sound an alarm and turn on a red light on a control panel on the bridge. (Tr. 203–05). The red light would indicate whether the smoke condition was in hold 1, 2, or 3. (Tr. 205). The smoke detection system was last inspected before the casualty on September 2, 1998, when it was inspected by a surveyor from the Isle of Man. (Tr. 205–06; CX 91, 92).

The HARMONY had a fire control and safety plan, which was posted in several places on board, in German and English. (Tr. 199–200; CX 95). The firefighting system included, in addition to the features described above, two seawater pumps, an emergency pump, a series of hydrants and hoses, fire extinguishers, and firefighting suits. (Tr. 200–03). The crew generally conducted fire and boat drills on Saturdays when the Harmony was at sea; the drills included running the fire pumps and running water through the hoses. (Tr. 211–14).[6]

The HARMONY was originally registered in Germany. In September 1998, just two months before the casualty, the ownership of the vessel changed as the HARMONY was acquired by Navigator Shipping, Ltd. ("Navigator"), a subsidiary formed for this purpose by Safmarine and CMBT Lines N.V. ("SCL"). (Tr. 101, 106; see CX 14, 15). Upon the purchase, the registry of the vessel was transferred to the Isle of Man. (See CX 14; Tr. 133).

At the time of the purchase, the Harmony was on charter to DiGregorio Navegacao Ltda. ("DiGregorio"), which had been employing the vessel as a member of the Independent Carriers Alliance (the "ICA"), a group of carriers (or "slot charterers") engaged in a liner service between the east coast of the United States and Brazil. The ICA included DiGregorio, Cho Yang Shipping Co. ("Cho Yang"), DSR Senator Lines GmbH, Montemar S.A. Pan–American Independent Line, Zim Israel Navigation Co., and Hanjin Shipping Co., and it operated a tonnage center, where stow planners prepared pre-stow and final stow plans. (Tr. 288–89, 832–33, 913–14). SCL did not have an immediate need for the Harmony, and thus it decided to and did re-charter the vessel to DiGregorio. (Tr. 106–08, 134; CX 16, 17). Around the same time SCL entered into crew and ship management agreements with Leonhardt & Blumberg ("L & B"), a reputable ship management company. (Tr. 134–40; CX 18, 19).

### 2. The Crew

At the time of the casualty, the DG HARMONY had a crew of twenty, exceeding the number (seventeen) required by the Safe Manning Certificate issued by the Isle of Man. (CX 22, 23; Tr. 218–19, 221). The crew included the captain, Michael Balitzki, from Germany;[7] the chief mate, Yuri Kovshel, from Russia; and the chief engineer, Ulrich Hahnemann, from Germany. (CX 23). Many of the crew members

---

6. The HARMONY's logbook shows, for example, an abandon ship drill on September 11, 1998, a fire fighting drill on September 26, 1998, and a fire fighting drill on October 17, 1998. (Tr. 248; CX 103 at 11861, 11862, 11863).

7. Balitzki received his master's license in 1992. (Tr. 189). Although he had a total of eleven to twelve years of seagoing experience,

the HARMONY was his first command. After working some years on shore, he returned to sea in July 1998 as chief officer of the HARMONY. Within several weeks, he was promoted to captain. (Tr. 193–94, 279–80). He was captain for only approximately three and a half months before the fire on November 9, 1998. (Tr. 194).

were from the Kiribati islands in the South Pacific. (*Id.*).

Both Captain Balitzki and chief mate Kovshel were trained in both firefighting and the handling of dangerous cargo and were certified in the handling of hazardous materials. (Tr. 186–88, 191, 241–43, 276–77, 279; CX 24 at 436–40; CX 98). Although Balitzki was ultimately in charge of ensuring the proper stowage of dangerous cargo aboard the HARMONY, he delegated the day-to-day responsibility for this task to the chief mate. (Tr. 240–41, 282).

### 3. *The Voyage*

The voyage commenced in New York on October 26, 1998, bound for Newport News, Virginia. The HARMONY arrived in Newport News on October 27th, where it took on the ten containers of cal-hypo. From there the HARMONY traveled to Savannah and then to Miami. It departed Miami on October 30th, bound for Rio de Janiero, Santos, and other ports in Brazil. (Tr. 222–23; CX 84 at 08210, 08211; CX 103 at 11816, 11825).

### 4. *The Fire*

On November 9, 1998, at approximately 7:20 a.m., as the HARMONY was off the coast of Brazil, Balitzki was in his bedroom when he felt the vessel shudder two or three times. (Tr. 224). Within three or four seconds, his phone rang. He went to the phone, which was located next to a window, looking forward. As he reached for the telephone, he looked out the window and saw dense, white, dirty smoke. He could see nothing else. The chief

mate, who had the watch, was on the phone, shouting into the phone. (Tr. 224–25, 312, 314; Kovshel Dep. 247–48, 351).

Balitzki got dressed and immediately went to the bridge, arriving at approximately 7:26 a.m. The chief mate was the only other person present. Again, the captain saw dense, white, dirty smoke. The general alarm had been sounded, alerting the crew that something was wrong and that therefore they should assemble. The smoke detection system indicated that there was smoke in hold 3 and the engine room. The captain sent the chief mate to the muster station, where the crew was gathering, and also instructed him to check the main deck. (Tr. 226–29; Kovshel Dep. 248–49, 351–52).

Balitzki checked the ship's course, the weather conditions, and the wind. He turned the ship to the starboard side, to clear the smoke from the deck. He then saw the flames for the first time. The vessel's speed had been reduced automatically because smoke had been detected in the engine room. (Tr. 227–28; *see* Kovshel Dep. 249–50).

Communicating by walkie-talkie, the chief mate reported to Balitzki that the vessel was on fire, in bay 26, the forward part of hold 3, on the port side. He also reported that one hatch cover was missing; the 22-ton hatch cover had been blown off by the force of the explosion.[8] Balitzki then checked the dangerous goods list and dangerous goods stowage plan, and saw that the fire had broken out approximately where the ten containers of cal-hypo had

---

8. Captain Balitzki gave conflicting statements on which hatch cover (or pontoon) was blown off. In his statement to the German authorities, he stated that the chief mate had reported that the "port side hatch cover of bay 30 was missing." (CX 84 at 10; *see* Tr. 319). At his deposition, first he testified that it was bay 26 and then he corrected it to bay 30. (*See* Tr. 335–37). At trial he testified that it was bay 26. (Tr. 375; *see also* Tr. 374–84). The day after Balitzki completed his testimony, however, the lawyers stipulated that if Balitzki were recalled to the stand he would testify that he was mistaken in saying it was bay 26 and that it was bay 30 where the hatch cover was blown off. (Tr. 512).

been stowed. (Tr. 228–29; Kovshel Dep. 250–53).

The crew immediately started fighting the fire, using all three firefighting pumps at maximum capacity, all hydrants, and all available fire hoses. They even took some hoses from the engine room. It quickly became clear, however, that the fire could not be extinguished with just water. (Tr. 229–31; Kovshel Dep. 248–50; *see* CX 110 at 2).

After approximately an hour, the port side fuel oil tank in hold 3 breached. The smoke, which had changed in color gradually from white to gray, turned to black. The fire started to spread, including onto the deck. At some point, the crew used the CO2 system to try to extinguish the fire. The captain did not believe the CO2 would work because a hatch cover had been blown off, but he tried it anyway. It did not work. (Tr. 231–33, 321; Kovshel Dep. 253). Approximately three hours after the fire started, Balitzki sent a distress signal, to a rescue center on land to coordinate rescue measures and send firefighting equipment. (Tr. 232, 324). Another ship had offered help within the first hour or so, but the captain had declined assistance because he thought he could bring the fire under control. (Tr. 322). Other ships also offered assistance, but Balitzki declined; he needed foam to fight what had become a petroleum fire, and he did not want to risk having a tanker come alongside the burning HARMONY. (Tr. 323; *see* Kovshel Dep. 395).

At approximately 3 p.m., Balitzki decided that most of the crew should abandon ship. He and five others, including the chief engineer and the chief mate, were to remain on board. The other fourteen crew members abandoned ship in a lifeboat at 6 p.m., while it was still daylight They were picked up by a German containership, the SEALAND URUGUAY, that had been following the HARMONY about a mile behind since noon. (Tr. 233–34, 322; Kovshel Dep. 257).

Balitzki and those who stayed behind took all the remaining fire hoses and nozzles and fixed them to railings and other extensions with the pumps running, intending to create a water curtain to protect the super-structure and engine area. At approximately 1:30 a.m., there was another explosion, on the starboard side of the vessel.[9] Balitzki decided it was no longer safe to remain on board, and at 2 a.m. he and the five others abandoned ship, transferring via a lifeboat to the SEALAND URUGUAY. (Tr. 235–36). The HARMONY continued to make speed, as its engine continued to run. (Tr. 236).[10]

Three or four days later, Balitzki reboarded the HARMONY, to release both anchors. (Tr. 236–38). The ship was still on fire, although the fire had "calmed down a little bit." (Tr. 238). The fire continued to burn, and did so for a total of approximately three weeks. (Tr. 239–40).

Eventually, the vessel was declared a total loss. The HARMONY had been pur-

9. There had been several other explosions as well. (Tr. 325–26; Kovshel Dep. 353).

10. PPG has argued in this case that the crew was negligent in its firefighting efforts. This argument was based largely on the testimony of its purported expert, Captain Gardiner. I found Captain Gardner's testimony to be wholly unpersuasive. He had had very little actual experience fighting fires (Tr. 920–21), and conceded that he was not an expert on firefighting. (Tr. 984–85). Moreover, the fire here was an extraordinary one. PPG's expert referred to the fire as "[a] horrific fire." (Tr. 1519). I conclude that Captain Balitzki and his crew did all that they reasonably could do—and more—to fight the fire. There was nothing else they could have done to control or stop the fire. PPG's claim that the crew was negligent in its firefighting efforts is rejected. (*See* Kovshel Dep. 357).

chased for $16.43 million but the estimated cost of repairs was more than $18 million. Hence, the decision was made to scrap the vessel. (Tr. 116; CX 67).

### 5. *The Investigation*

The various interests retained fire investigators shortly after the incident. For approximately two days in January 1999 and three days in February 1999 six fire investigators inspected the HARMONY in Curacao. These included Dr. Geoffrey Philip Bound, retained by the cargo interests and vessel owners, and Dr. Roger McCarthy, for PPG. In general, the investigators viewed the fire scene as a group, taking photographs and videos as the debris was removed, bit by bit. The investigators were permitted to walk around on the vessel, getting close to objects, including the remains and burnt-out ruins of containers. (Tr. 498–504). Eventually, the containers (or their remains) were removed and examined, with the investigators observing and inspecting each container during the process. (Tr. 547). Fluorescent spray paint was used to mark the container numbers on the containers (or ruins thereof) as they were removed; the various investigators conferred and agreed on the container number before the number was painted onto the container. (Tr. 553). As Dr. Bound testified:

> Investigating a containership [fire] is like taking apart a 3–dimensional jigsaw. You only get one chance to look at the evidence as it becomes uncovered....

(Tr. 501). The investigators focused their attention on hold 3 and, in particular, the area in hold 3 where the containers of cal-hypo had been stowed.

### B. *The Cargo*

#### 1. *Cal–Hypo*

Cal-hypo is a bactericide used to purify water. It is a molecule containing calcium chlorine and oxygen in a form that is a "fairly high-energy material." (Tr. 599). When it decomposes, it liberates oxygen and chlorine. Cal-hypo will decompose at room temperature. The higher the temperature it is exposed to, the greater the rate of decomposition. (Tr. 599; Simmons Dep. 21). When cal-hypo decomposes, it liberates heat and heats itself up. Cal-hypo reacts faster when it gets hot. (Tr. 600, 1312–13). When cal-hypo is stored in a drum, heat is retained inside the drum. The larger the mass, the harder it is for the heat to escape, and the decomposition is likely to increase. Similarly, the higher the ambient temperature (the temperature of the atmosphere surrounding the drum), heat loss becomes more difficult and the temperature inside the drum will increase. (Tr. 601–03, 1313–14).

When cal-hypo reaches "decomposition temperature," there is a rapid breakdown of the material, liberating oxygen. The rapid decomposition throws white particulate material around, which has the appearance of fine smoke. A great deal of heat is also liberated, which can ignite materials in the immediate vicinity, which may result in a white or cream-colored smoke. The term "critical temperature" or "critical ambient temperature" (or "CAT") refers to the ambient temperature at which the heat from the material inside the drum cannot escape fast enough, heat is retained inside, and the material in the drum becomes hotter, increasing to the point of self-decomposition. The reaction becomes circular and "runs away"—the material explodes, decomposes, and a fire ensues. (Tr. 603–04).[11] The term "self-

---

11. *See also Standard Commercial Tobacco Co. v. M/V "RECIFE,"* 827 F.Supp. 990, 993 (S.D.N.Y.1993) ("The critical temperature of calcium hypochlorite (the temperature at

accelerating decomposition temperature" (or "SADT") is used in the United Nations testing procedures, and is the ambient temperature at which the bulk of the material in a specific package (once it is within 2°C of the ambient temperature) will rise by a temperature of 6°C within the period of seven days. (Tr. 605–06, 676). CAT and SADT are similar, but the SADT does not necessarily result in thermal runaway while the CAT does. (Tr. 606–07).

The placement of drums of cal-hypo adjacent to each other will make it more difficult for the heat to dissipate. Hence, the critical temperature for a stack of drums will be lower than for an individual drum, because it is harder for the heat to dissipate. (Tr. 604–05, 643–44, 1316). A container stuffed with drums creates a double risk—the stacking of a larger number of drums creates more heat and the container walls inhibit the ventilation of the drums. A containerized stack of drums is likely to have a lower critical temperature than the same stack of drums not stuffed in a container. (Tr. 605; *see also* Simmons Dep. 239 ("the mass of the material in the package is a factor" in determining the CAT), 244 (CAT is lower in "larger packages"); Banks Dep. 69 ("SADT varies with respect to package size."), 70 ("[L]arger packages have lower SADTs."); Ferguson Dep. 201–02).

## 2. *The Transportation of Hazardous Materials*

The International Maritime Organization (the "IMO"), which is affiliated with the United States (the "UN"), has developed a code, the International Maritime Dangerous Goods Code (the "IMDG Code" or the "Code"), to govern the carriage of dangerous goods aboard ships. (Tr. 111, 802–03; CX 2). There is an International Convention for the Safety of Life at Sea ("SOLAS"), to which the United States and other member nations of the UN are signatories. The members of the IMO and the signatories to the SOLAS convention have adopted the IMDG Code. (Tr. 114–15; CX 2, Vol. I, at 0002–04).

The Code is relied on by shippers, manufacturers, tonnage centers, stowage planners, and ships' crews to make decisions on the carriage and stowage of dangerous goods. The Code is "absolutely critical" in the system for the transportation of dangerous goods by sea: "It is the bible for people who go to sea." (Tr. 112–13; *see also* Tr. 681).

Cal-hypo is a Class 5.1 oxidizer designated as "UN 2880" in the IMDG Code and the Hazardous Materials Table of the Department of Transportation ("DOT") regulations, 49 C.F.R. § 172.101. (CX 3 at 127; CX2, Part 3 at 5138).[12] The IMDG Code provides stowage instructions specifically for UN 2880, as follows:

*Stowage*

Category A.

"Away from" sources of heat where temperatures in excess of 55°C for a period of 24 hours or more will be encountered. "Separated from" powdered metals, ammonium compounds, cyanides and hydrogen peroxide.

*Packing, Stowage & Segregation*

See also General Introduction and introduction to this class.

---

which runaway thermal decomposition occurs) depends inversely upon the size of the sample; as the mass increases, the critical temperature decreases. A mass of calcium hypochlorite will generate heat in direct proportion to its volume.").

12. This case involves calcium hypochlorite hydrated, UN 2880. Calcium hypochlorite comes in other forms as well, which have other UN designations. (*See* CX2, Part 3 at 5137–38).

(CX 2, Part 3 at 5138). Category A includes cargo ships, and stowage is permitted on deck or under deck. (CX 2, Part 1 at 0122). The reference to 55°C (which is equivalent to 131°F) is to the ambient temperature, or the air temperature surrounding the cargo, and not to the temperature of the heat source itself. (Tr. 266, 694).[13]

In addition to the individual schedules, the IMDG Code includes a general introduction that sets forth general principles, including the following:

14.2 Substances, materials and articles should be stowed as indicated in the individual schedules in the various classes in accordance with one of the categories specified below. . . .

.    .    .    .    .

14.6 In view of the high protective advantages, stowage *under deck* has been recommended whenever possible, except that, for certain articles of class 1 whose principal hazard is the production of smoke or toxic fumes, stowage *on deck* has been recommended. . . .

.    .    .    .    .

14.12 Where it is necessary to prevent pressure build-up, decomposition or polymerization of a substance, the packages should be stowed *shaded from radiant heat*, which includes protection from strong sunlight.

14.13 When it is recommended in individual schedules that the substance should be *shaded from radiant heat*, stowage *under deck* should be "away from" sources of heat, including sparks, flame, steam pipes, heating coils, etc. (CX 2, Part 1 at 0122–24; *see generally* Tr. 681–84).[14] Where there is a conflict between instructions in an individual schedule and the general introduction, the individual schedule takes precedence. (Tr. 684–86; CX 2, Part 1 at 0122 (14.2), 0127 (15.1.6)).

The transportation of hazardous materials is also governed by DOT regulations, including 49 C.F.R. § 173.21, which provides in part:

Unless otherwise provided in this subchapter, the offering for transportation or transportation of the following is forbidden:

.    .    .    .    .

(f) A package containing a material which is likely to decompose with a self-accelerated decomposition temperature (SADT) of 50°C (122°F) or less . . . with an evolution of a dangerous quantity of heat or gas when decomposing . . ., unless the material is stabilized or inhibited in a manner to preclude such evolution. The SADT may be determined by any of the test methods described in Part II of the UN Manual of Tests and Criteria.

(CX 3 at 357–58). One means of stabilizing or inhibiting decomposition is the use of refrigerated containers. (Tr. 672).

13. In introductory comments to Class 4.1 materials, the Code provides stricter stowage precautions: "In general, substances of this class should be kept as cool and as dry as reasonably practicable during transit and should be stowed 'away from' all sources of heat, including sparks, flame, steampipes, heating coils, etc." (CX 2, Part 3 at 4119). Likewise, the restrictions for UN 1748, calcium hypochlorite dry or "mixture, dry," could be stowed on deck only and " '[a]way from' sources of heat," without reference to temperatures in excess of 55 C for 24 hours or more. (*Id.* at 5137; *see* Tr. 853–57, 876–77).

14. In 1998, the IMDG Code definition of "sources of heat" did not specifically include heater bunker tanks, although the word "etc." does appear. (CX 2, Part 1 at 0124 (14.13)). In 2002, the Code was amended effective January 1, 2003 to include "top of side walls of heated fuel and cargo tanks" as a source of heat. (Tr. 690–92; OX 7 (7.1.1.15)).

The IMDG Code provides that cargo having an SADT of "over 35°C" (95°F) must be transported at a "control temperature" of 10°C less than the SADT. (CX 2, Part 1 at 0155).[15] The control temperature is the maximum temperature at which substances such as self-reactive materials can be safely transported. (*Id.*). Hence, if a cargo has an SADT of 45°C, the control temperature would be 35°C. (Tr. 673–74).

The DOT regulations also require a shipper "who offers a hazardous material for transportation" to certify that the regulations have been complied with, including as to classification, packaging, and labeling. (CX 3 at 291 (49 C.F.R. § 172.204)). The shipper must tell the carrier what the UN number is so that the carrier can then refer to the IMDG Code to determine the stowage requirements. (Tr. 885).

### 3. *The Cal–Hypo on the HARMONY*

The cal-hypo at issue in this case was manufactured by PPG at its plant in Natrium, West Virginia in mid-October 1998. (Tr. 1248–51, 2078). PPG booked the shipment of ten containers of UN 2880 with Cho Yang, which processed the booking request through the ICA tonnage center. (CX 4; Tr. 913–14).

The cal-hypo was placed in 136–kilogram (or 300–pound) fiber drums made of a thick cardboard with metal rings at the top and bottom. The temperature of the cal-hypo was approximately 34°C (93.2°F) when it was placed in the drums. Four drums were placed on each wooden pallet and each pallet was then immediately shrink-wrapped in plastic. The shrink-wrapped pallets were then loaded into the containers, 30 pallets in 3 layers of 10 pallets each, 5 pallets on each side of the container, for a total of 120 drums in each container.[16] As a consequence, the tightly-wrapped containers were packed into the unventilated containers, stacked three-high, with very little air space and a large quantity of cal-hypo (36,000 pounds) in each container. PPG did the packing and loading—selecting the pallets, loading the drums onto the pallets, shrink-wrapping the drums onto the pallets, and then placing the pallets into the containers. The bottom layer sits on the floor of the container, and there is no separation between the pallets on each side of the container or between the layers. The containers were provided by Cho Yang and inspected by PPG. (Tr. 563–64, 608–10, 2078–84; *see* PX 111; OX 30, 31, 43; *see also* Patterson Dep. 113, 134–35; Ferguson Dep. 29). The containers were not refrigerated.[17]

---

15. The Code did not give "control" or "emergency" temperatures for UN 2880, as it did for certain other materials. (*See, e.g.,* CX 2, Part 3 at 4169–6a).

16. The 136–kilogram drums could be stacked three high in a container, while the 196–kilogram drums—which were taller but the same diameter—could only be stacked two high in a container. Consequently, although the 136–kilogram drum is smaller, more of them could be stowed into a standard size container and the critical temperature of a container of the smaller drums was lower than the critical temperature of a container of the larger drums. (Tr. 621–22). PPG's product safety manager noted that 300–pound drums should not be stacked in warehouses

more than two high for prolonged periods of time, although he testified that he might consider going more than two high on a ship because that would be for a shorter period of time. (Lee Dep. 309–11).

17. PPG ships cal-hypo in refrigerated containers infrequently, and only when it has no other alternative. (Kuhn Dep. 257–59). At least one carrier, Maersk, will accept cal-hypo only in refrigerated containers. Maersk put that requirement in place some time in 1999. Transporting cal-hypo in a refrigerated container increases the transportation cost per container from $1,000 to $3,400. PPG bears that additional cost. (Kuhn Dep, 255–58; *see also* Ham Dep. 259).

The containers were shipped out by truck approximately 36 hours after the cal-hypo was manufactured, under circumstances that did not permit it to cool down. (Tr.2078). In transit, the containers were exposed to some sun, although there would have been some cooling at night (although not markedly). (Tr. 2078–81); see PX 169 at 0876. The temperature inside a container can be significantly higher than the ambient temperature. (Tr. 2079–80; PX 168 at 3).

The ten containers were loaded onto the HARMONY at Newport News, Virginia in late October 1998. (CX 4; Tr. 222). They were accompanied by a three-page dangerous goods summary. (Tr. 255; CX 105). The summary showed that the ten containers contained cal-hypo and identified the cargo as class 5.1 UN 2880. (CX 105). PPG also provided dock receipts for the ten containers describing the material as follows:

> 120 (136 KG DRUM) RQ CALCIUM HYPOCHLORITE HYDRATED CLASS 5.1 UN2880 PACKING GROUP II IMDG PG 5138 ERG # 45

(See CX 6; Tr. 697, 700–01). The reference to "PG 5138" was to page 5138 of the IMDG Code. (CX 2, Part 3 at 5138). The reference to "ERG # 45" was to an outdated Emergency Response Guide publication. (Tr. 702). The dock receipts included the following certifications, signed by a representative of PPG:

> It is declared that the packing of the container ... has been carried out in accordance with the general introduction IMDG code, paragraph 12.3.7. ...

> This is to certify that the above-named materials are properly classified, described, marked, labeled, and are in proper condition for transportation, ac-

cording to applicable regulations of the [DOT].

(See CX 6; Tr. 699–01).

The containers were also accompanied by a Material Safety Data Sheet prepared by PPG. (See Tr. 704–05, 887–88). The sheet warned that the product was a "Strong Oxidizing Agent" that could cause fire or explosion with contamination. (CX 184 at 5406). The sheet also stated that "[p]roduct decomposes at 180 C releasing oxygen gas." (Id. at 5407). It also stated that the product was to be stored "in a cool, dry, well-ventilated place ..., away from heat, sparks, flames, direct sunlight, and other sources of heat." (Id. at 5408). With respect to stability, it stated that the product was "[u]nstable above 117 C." (Id. at 5409). It also stated, with respect to transportation information, that the product was a 5.1 oxidizer, UN 2880. (Id. at 5411).

In general, when the HARMONY arrived in a port, the vessel would receive a general loading plan covering all cargo that was going onto or off the vessel in that particular port. (Tr. 249). When dangerous goods were loaded on board, Balitzki, the captain, would receive dangerous goods manifests. He would sign for them and then pass them on to the chief mate, who was the cargo officer. (Tr. 243). The chief mate would check the ship's documents of compliance to ensure the proper stowage of dangerous goods. (Tr. 249–50). Once the chief mate determined that the cargo was permitted by the document of compliance, he would then check the IMDG Code to determine whether there were any specific stowage restrictions. (Tr. 254–55; see Kovshel Dep. 398–400). The captain and the chief mate would also consult the Storck Guide, which set forth guidelines on segregation. (Tr. 283–86; CX 83).

On this voyage, the ten containers of cal-hypo were stowed in hold 3, in bays 25 and 27, in slots 270802, 270602, 270402, 250802, 250602, 250402, 250804, 250604, 250404, and 250406. The port sides of containers 270802, 250802, and 250804 were adjacent to the No. 5 heated port side bunker tank in hold 3. (PX 92).[18] There was a gap of some twelve inches between the tank wall and the containers, because cell guides—bars—were affixed to the wall to keep the containers in position while the ship was at sea. (Tr. 361–63). Containers 270802 and 250802 also sat directly above the port side bunker tank, although there was a gap, less than twelve inches, between the tank top and the bottom of the container because there was a securing device to hold the containers in place. (Tr. 374). Hence, the latter two containers were exposed to the heated bunker tanks both on the bottom and on the port side. (PX 92). The adjacent containers—270602 and 250602—sat on top of the water ballast tank, which went down to the outer skin of the ship. (Tr. 369; *see* PX 92).

The HARMONY had three main bunker tanks: one on the port side, one on the starboard side, and one in the center. (Tr. 302–03, 309). Fuel was drawn on alternating days from the port side tank and the starboard tank. (Tr. 309). The fuel was transferred from one of these storage tanks to the service tank. (Tr. 304, 309). When fuel was to be transferred from one of the storage tanks, that tank would be heated for half an hour to an hour to warm up the fuel—to make it "pumpable" to facilitate transfer. Otherwise, the tanks were not heated. (Tr. 304, 308–11; Kovshel Dep. 244, 2885). On the date of the fire, the fuel had not been drawn from the port side bunker tank, no. 5, the tank in question.[19]

The temperature in hold 3 ranged from approximately 35°C to approximately 40°C (or approximately 95° to 104°F). (Tr. 260, 262, 305, 1749, 2115). Balitzki had been in hold 3 about two days before the casualty, and the hold temperature was slightly above body temperature—"probably" 40°C. (Tr. 262).[20] Kovshel was not concerned because he knew that the temperature in the hold would not reach 55°C and therefore there was no risk of violating the Code. (Kovshel Dep. 400–01)

Both the captain and the chief mate were aware of, and approved, the stowage positions of the cal-hypo near bunker tank 5. (Tr. 259–60). The captain explained that he was comfortable with this stowage plan because it was not prohibited. (Tr. 260). Likewise, the chief mate approved of the location. (Kovshel Dep. 242–45, 398–99). The HARMONY'S Document of

18. Although the containers had actual container numbers, I will refer to them by the slot numbers, as the parties often did during the trial.

19. Dr. Bound confirmed, in his inspection, that the fuel indicators were marked with a tag saying "take from this side," pointing to the starboard side, and on the bunker line the valve to the port side tank was in the closed position. (Tr. 586, 588). In addition, Dr. Bound's examination of the steam heating system showed that the steam valve was in a closed position while the steam condensate return valve was in an open position, indicating that the bunker tank was not being heated at the time of the casualty. (Tr. 586–87; *see* Tr. 357). There were no temperature devices on the HARMONY to record the temperatures of the fuel. (Tr. 304–05). CX 37 shows a temperature of 37°C for the fuel in bunker tank 5 on November 8, 1998. (CX 37 at 08901; *see* Tr. 269–70, 348–49).

20. The record contains some evidence to suggest that the temperature in the hold was somewhat lower, 30° to 35° to 37° to 38°C. (*See, e.g.,* Yukimuk Dep. 354–57; Yovshel Dep. 211, 464). Of course, these temperatures are based on estimates and not actual

Compliance showed that cargo designated class 5.1 could be stored in hold 3. (CX 21; *see also* CX 20, 93; Tr. 250–54, 687–88).

The HARMONY had a list of all the dangerous goods containers on board when the vessel departed Miami on October 30, 1998. (Tr. 256; CX 30). The vessel also had a bay plan showing the stowage positions of all the dangerous cargo containers. (Tr. 256; CX 31). There was no other hazardous material stowed in hold 3.[21] There were some additional hazardous materials stored under deck in holds 1 and 2. (Tr. 389–90; Kovshel Dep. 360).

### 4. *The P & I Club Circular*

On September 1, 1998, in New York, Balitzki received a box of correspondence, videos, and other materials from Leonhardt & Blumberg. (Tr. 298–99; CX 39). Included was a circular from the Swedish Club dated July 1998 setting forth a "Member Alert." (CX 40). The circular stated in part:

> In the course of investigating a serious fire onboard a container vessel, the fire experts appointed by us have undertaken a research of how Calcium Hypochlorite (hydrated) reacts to heat exposure. The preliminary results have such serious implications regarding the transportation of this material that we have decided to immediately advise the shipping community of the findings. Our fire experts have issued the statement below, which will be brought to the attention of amongst others the IMO.

> .    .    .    .    .

> "The current IMO recommendation is that material is not to be exposed to a heat source in excess of 55°C for longer than a 24–hour period. Preliminary results of the research indicate, however, that for the type and size of packaging used routinely to ship this material around the world, the temperatures at which the runaway reaction is likely to begin may be much lower than that recommended by the IMO (IMDG Code—Page 5138).

> "It is our understanding that the ambient temperature of holds of certain container ships can reach the critical ambient temperature of this material, which preliminary results of our research suggests is considerably lower than that previously published.

> "Accordingly, it is suggested that this material is not shipped in the holds of such ships and if stowage on deck is arranged, heating of this material by direct sunlight must be avoided."

(CX 40).

### 5. *PPG's Prior Knowledge of the Risks Presented By the Shipping of Cal–Hypo*

The Swedish Club circular was issued based on a fire and explosion that occurred in containers of cal-hypo on the M/V CONTSHIP FRANCE in October 1997, about one year prior to the HARMONY fire. PPG concluded that the cause of the explosion was the stowage of the UN 2880 adjacent to heated bunker tanks. (Ferguson Dep. 573; Lee Dep. 319–22).

PPG knew that cal-hypo "is decomposing all the time. It is relatively unstable." (Allen Dep. 86). Its product safety manager believed that cal-hypo should be stored in "a dry, cool place," one that was "certainly not warm, certainly not hot," meaning 90°F (or 32.2°C) or less. (Lee

thermometer readings. (*See* Kovshel Dep. 553).

21. Of course, it is possible that some of the other containers in hold 3 contained hazardous material that was not properly declared; no bills of lading were provided for four of the containers in the hold. (*See* Tr. 1487). But this is purely speculative, and I have little doubt but that the fire started in the containers of cal-hypo.

Dep. 176–78; *accord* Ferguson Dep. 102 ("cool" means less than 90°F); Allen Dep. 575). In fact, the product safety manager testified: "our literature says 90 degrees F." (Lee Dep. 177). He also testified that these guidelines should apply not just for storage but also for transporting cal-hypo. (*Id.* 177–78 ("[c]ertainly" below 90°F); *see also* Ferguson Dep. 134).

PPG had done some temperature monitoring in the 1980s in containers in container ships and found temperatures in the 110° to 115°F range (approximately 43° to 46°C). (Lee Dep. 222, 227). The product safety manager was of the view that UN 2880 should be restricted to deck stowage, but he was persuaded that this was a decision that should be left to the master of the ship. (*Id.* 73–75).

PPG was also aware that cal-hypo, and in particular UN 2880, had been involved in numerous land-based explosions or fires over the years, including some resulting in the destruction of warehouses or large stores. For example, the former product safety manager of PPG, who retired in April 2000, recalled 10 to 12 PPG cal-hypo fires or explosions, on-site or off-site, over some 20 years. (*Id.* 10, 16–18, 130–31). He was aware of another 20 fires or explosions not involving PPG over the same period. (*Id.* 131–32; *see id.* 132–42). There was a cal-hypo fire in a PPG warehouse in the late 1980s, as a result of which PPG changed its procedures for storing one-ton bags of cal-hypo to require monitoring of temperatures. (Patterson Dep. 196, 199, 302, 304–05). One of these changes was to ensure that the "packout temperature," i.e., the temperature of the product as it went into the bags, was 90°F (32.2°C) or less. (Lee Dep. 178–79). In addition, the one-ton bags were used only when they could be transported by truck within a radius of eight to ten hours, and only in refrigerated containers set to a

temperature of "probably 70 degrees F, 80 degrees F, something like that," considerably below 90°F. (*Id.* 180–81; *cf.* Ferguson Dep. 390–91 (temperature of refrigerated trucks carrying "super sacks" of cal-hypo is set to 60° to 70°F)).

### 6. *PPG's Use of the 300–Pound Drum*

Prior to 1994, PPG did not ship cal-hypo in package sizes larger than 45 kilos (100 pounds). Customers began requesting larger packages, however, because larger packages enabled them to repackage the product more efficiently. In 1994, PPG began shipping in 400–pound drums. (Kuhn Dep. 43–44). It chose the 400–pound fiber drums because that was what was "available"—that was the drum PPG was using for domestic customers. (*Id.* 55–56).

In 1998, as it continued to use 400–pound drums, PPG also began to ship cal-hypo overseas in 300–pound (or 136–kilogram) drums. This was also done at the request of a customer. (*Id.* 61). PPG did not have any special procedures for utilizing the 300–pound drums. (Patterson Dep. 200). No new instructions were provided to the loaders when the 300–pound drum was introduced. (*Id.* 274–75). PPG did not do any testing on the use of the 300–pound drums for shipping cal-hypo. (Banks Dep. 126–27; *see* Ferguson Dep. 809 ("There were no studies done when we [PPG] instituted the 300–pound drums.")). Nor did PPG obtain any material, results, documentation, or reports from the manufacturer of the drums with respect to any testing done on the drums. (Banks Dep. 130–31). PPG conducted no testing of the use of any fiber drums to hold cal-hypo. (*Id.* 139–40). Nor did PPG consider the impact of stowing 136–kilogram fiber drums of cal-hypo packed three-high in a 20–foot container. (*Id.* 149–50). Nor did PPG conduct any tests or research regard-

ing ventilation when cal-hypo is stored in a shipping container. (*Id.* 300; Lee Dep. 263–64). Prior to 1999, PPG had not done any SADT testing of various sizes of drums holding cal-hypo. (Banks Dep. 170–71; *see id.* 380; *see also* Lee Dep. 161–62, 171–72, 748–49).[22]

In August 1999, after the fires on the CONTSHIP FRANCE and the HARMONY, PPG stopped shipping cal-hypo overseas in drums larger than 45 kilos. (*See* Kuhn Dep. 63–64, 70; PX 31; Patterson Dep. 111–12).[23]

### 7. *Other Lawsuits Involving Cal-Hypo*

On October 15, 1997, the M/V CONTSHIP, while docked in Papeete, Tahiti, caught fire following an explosion in a container holding UN 2880 packed in 193–kilogram (or 425–pound) drums. Eventually, suit was brought against the manufacturer, PPG. *See Conti Zweite Cristallo Schiffarhrts GMBH & Co. KG v. PPG Indus., Inc.*, No. 99 Civ. 10545, Tr. at 1357–67 (S.D.N.Y.). Ruling from the bench following trial, Judge Stanton found that the fire was caused because the container was placed directly above the bottom center fuel tank of the vessel and the vessel's fuel tanks were heated to "exceptionally high temperatures." *Id.* at 1359–60.[24] Judge Stanton dismissed the claims against PPG.

On September 7, 1991, the M/V RECIFE caught fire at sea while bound for North Carolina after an explosion in a container holding chlorine replacement cartridges that contained a different form of cal-hypo, UN 1748. *Standard Commercial Tobacco Co. v. M/V "RECIFE,"* 827 F.Supp. 990, 992–93 (S.D.N.Y.1993). The cal-hypo, which was not manufactured by PPG, was in pellets, packed ten to a plastic tube, four tubes per box, and four boxes per carton, with 1,005 cartons packed into the container. *Id.* at 992. The container was stowed on deck, where it was exposed to sunlight, as the result of which the temperature inside the container reached 156°F (68°C). *Id.* Suit was brought against the vessel. The court concluded that the fire was caused by the stowage of the container in direct sunlight, but concluded that the vessel interests were not negligent because the stowage was in compliance with the IMDG Code. *Id.* at 997–98.

On March 14, 1970, the M/V NICOLAOS D.L. caught fire as it was preparing to leave the Port of Savannah, Georgia. *Ionmar Compania Naviera, S.A. v. Olin Corp.,* 666 F.2d 897, 898 (5th Cir.1982). The fire was caused when a cal-hypo compound (70% cal-hypo and 30% inert substances) accidentally spilled and mixed with organic material (sawdust), igniting a fire. *Id.* at 898, 902–04. Cargo interests sued the vessel, the stevedore, and Olin, the manufacturer of the cal-hypo com

---

**22.** There was some limited testing done in 1989 or 1990 on small quantities of cal-hypo to model what would happen in the use of one-ton bags. (Ferguson Dep. 72–73, 81–82, 84).

**23.** A senior account representative at PPG responsible for international sales and customer development was unwilling or unable to answer questions about why PPG stopped shipping cal-hypo in drums larger than 45 kilos. (Kuhn Dep. 63–91). She did acknowl

edge that she told customers that PPG was not going to ship anything larger than 45–kilogram drums because PPG was "having problems getting bookings on vessels." (*Id.* 64; *see id.* 65–67, 116–17, 290–91). I find that PPG discontinued use of packages larger than 45–kilograms because carriers began refusing to transport cal-hypo in larger packages due to safety concerns. (*See* PX 31).

**24.** PPG—or at least some of its employees— understood the bunker tanks on the CONTSHIP FRANCE were heated to 82°C. (Lee

pound. On appeal, the circuit court concluded that Olin had a duty to warn the vessel interests and stevedore of the hazards of which they could not reasonably have been expected to be aware, but remanded for further findings on the failure-to-warn claims and on the issue of whether the stowage was negligent. *Id.* at 904–05. The court noted that the cal-hypo compound "present[ed] a serious fire hazard," and that when it "decomposes, enough heat is produced to ignite any combustible material." *Id.* at 899.

### 8. *Testing of Cal–Hypo*

Tests were performed on the stability of cal-hypo after the fire on the HARMONY.[25]

In 1999, PPG asked Safety Consulting Engineers, Inc. ("SCE") to perform tests on cal-hypo in two types of containers: 100–lb plastic buckets with screw-on lids and 300–pound (or 136–kilogram) fiber drums with clamp-on lids. (PX 50 at 0029, 0032). An oven was built and a container of cal-hypo was placed into the oven, sitting on a wooden pallet. The heat was turned on and thermocouples (temperature recording devices) measured the temperature. (*Id.* at 0030). These were SADT tests performed per UN guidelines. (*Id.* at 0029). Once the temperature of the material reached 2°C below the test chamber temperature (the ambient temperature), the time was noted and the test was

continued for up to seven days to determine whether the sample temperature increased by at least 6°C. (*Id.* at 0030, 0032).

In the one run performed on 300–lb drums, the oven temperature was set at 50°C and the temperature increased by more than 6°C—indeed, it rose to a maximum of 60.9°C in 177.2 hours. (*Id.* at 0032, 0037; OX 9).[26] One run, using 100–lb drums and a test temperature of 54°C, resulted in the material going into "full reaction," with a maximum temperature of 225°C reached in 200 hours. (*Id.* at 0032, 0035). A third test, using a 100–lb drum and a test temperature of 57°C, also resulted in an increase of more than 6°C, as the temperature increased to 67.1°C in just 79.5 hours. (*Id.* at 0032, 0036).

Hence, three of the five runs failed the SADT test. One run (using a 100–lb drum and a test temperature of 52°C) resulted in an increase of 5°C and was deemed "borderline," while one run (using a 100–lb drum and a test temperature of 50°C) resulted in an increase of only 4°C. (*Id.* at 0032, 0038, 0039; *see* Ferguson Dep. 658–63, 674–83).

In 2001, PPG engaged Touchstone Research Laboratory, Ltd. ("Touchstone") to perform some experiments on cal-hypo. Touchstone built an "oven" large enough to hold a 20–foot container, which was filled with drums of cal-hypo. Thermocouples were placed among the drums and

---

Dep. 319); *cf.* Ferguson Dep. 573 (50° to 60°C).

**25.** In contrast, no safety tests were conducted after the CONTSHIP FRANCE fire because PPG believed it "understood what caused the problem and there was no need for [PPG] to do any further work." (Lee Dep. 652–53). Likewise, although PPG knew that the cal-hypo containers on board the CONTSHIP FRANCE were stowed in proximity to heated bunker tanks, PPG did not do anything in response to this information to ensure that

cal-hypo was not stowed in proximity to heated fuel tanks on subsequent voyages. (Ham Dep. 459–60).

**26.** It would appear that the oven was turned off during this run at approximately the 160–hour mark. (*See* Tr. 677; PX 50 at 0037). It would also appear that the material was brought into the test facility at "a very low temperature," approximately 8°C, and that the number of hours given included the time needed for the material to "warm up" to within 2°C of the ambient temperature of 50°C. (Tr. 676–77; PX 50 at 0037).

elsewhere in the container. The oven was heated and the thermocouples recorded temperature changes. The test was run several times, with adjustments for, among other things, size of drum and oven temperature. (Tr. 621–32; CX 51).

One test was run in May 2001 using a container filled with eighty 196–kilogram drums of cal-hypo (stacked two-high), with the oven temperature set at 41°C (106°F). (Tr. 624–26; CX 51). The starting temperature of the various materials was approximately 25°C and it increased to 41°C in roughly 220 hours. (Tr. 628; PX 57). The cal-hypo inside the drums then increased slowly but steadily until roughly 580 hours, when there was a very sharp increase in the temperatures inside the drums of cal-hypo. (Tr. 628–29). In fact, at 609 hours, the oven automatically turned off. As the Touchstone report explained:

> After a total of 609 hours the Cal-hypo in the shipping container became *self-accelerating* causing the control system to trigger the alarm and shut down the heating system.

(CX 51 at T0833) (emphasis added).[27]

## C. *The Cause and Origin of the Fire*

### 1. *The Experts*

PPG's principal expert witness on the cause and origin of the fire was Dr. Roger McCarthy. I did not find his testimony credible. He had no recollection of having done a cause and origin investigation regarding a container vessel or cargo ship prior to the HARMONY. (Tr. 1659). Although he had authored some 60 articles, not one involved a vessel fire or a cause and origin investigation. (Tr. 1646–49). He had no recollection of using the Code before this case. (Tr. 1659). His compa-

ny, Exponent, Inc. ("Exponent"), provides a wide range of engineering and scientific consulting services, but he was not listed on Exponent's website under "marine services" or "fire and explosions," although he was listed under "data/risk analysis," "mechanical engineering," and "vehicle engineering," among others. (Tr. 1660–63). He was mistaken as to the meaning of the term "trim"; the trim of the HARMONY was down by the stern, meaning unburned fuel that hit the floor would flow toward the stern. (Tr. 1709–11).

Dr. McCarthy's testimony was problematic in other ways. For example, he testified that he did not shoot any video when he was on board the Harmony for the inspections because of "[i]nsufficient lighting" (Tr. 1667), and when shown bills revealing that Exponent had charged PPG for "video" expenses, he testified that he was "virtually certain" the reference was to the purchase of news video of the HARMONY sailing into the harbor. (Tr. 1677). Yet, on the fourteenth day of trial, PPG counsel announced that Exponent had found four videotapes taken during inspections of the vessel. (Tr. 1850–51, 1854). The videotapes were then produced for the first time in the litigation, and Dr. Bound relied on them when he testified on plaintiff's rebuttal case on May 17, 2004. (Tr. 2027–28).

Dr. McCarthy also acknowledged that he prepared at least a dozen drafts of his report, and yet he did not retain a copy of any draft, either electronically or on paper. (Tr. 1631–33, 1680). Moreover, he testified that he had not taken a single note during his investigation. (Tr. 1678, 1702–03). Although he sent some e-mails, pur-

---

**27.** In a later draft, Touchstone revised this language, toning it down to read instead: "After a total of 609 hours the control thermocouple in the 'core' drum reached the pre-set shut-off temperature of 112 degrees F, the heating system shut down and the cooling fans were activated." (CX 51 at T0831).

portedly they were not substantive and in any event were not retained. (Tr. 1678–79, 1695). He did not write down any measurements (*e.g.*, the length of a pipe or the distance from a container to the wall). (Tr. 1690–91). He took more than a thousand photographs over the course of three inspections, and yet did not take one note to remind him where or when or of what a particular photograph was taken. (Tr. 1496, 1691). During cross-examination, he was unable to recognize photographs that he had taken himself. (Tr. 1718–22, 1726). At the time of trial Dr. McCarthy had only one writing that reflected any of his observations made during his three inspections of the HARMONY in 1998—his final report. (Tr. 1679–80). It is not credible that Dr. McCarthy took no notes, and even assuming he took none, it is not credible that he could remember what was shown in the photographs with any precision.

I found plaintiffs' expert, Dr. Bound, to be forthright and credible. With some minor exceptions, I accept his testimony.

## 2. *Where Did the Fire Start?*

The fire was the result of an explosion in a container of cal-hypo stowed on the port side of hold 3—container 250404, the container in row 04 and tier 04 in bay 25, three in from the port side of the vessel and two up from the bottom. (Tr. 506; *see* PX 92–A). That this was the point of the start of the fire is demonstrated convincingly by the following:

1. Photographs taken on the vessel during the fire show large flames rising from hold 3. (CX 107, 108, 110 at 2; *see* Tr. 230–231, 520–23; PX 73). Another photograph taken by a crew member shortly after the first group left the ship confirms that the fire was burning primarily in hold 3. (CX 110 at 1; *see* Tr. 239).

2. The physical inspection showed major damage and collapse around hold 3. In particular, there was major damage in the forward part of hold 3 in the area of bays 26 and 30. (Tr. 523–31; PX 74, 75, 77, 78, 79, 80, 81).

3. The physical evidence showed that the fire spread from hold 3 primarily from aft to forward, although to some extent it spread aft as well. There was damage in the area of hold 2, but the damage was more severe at the aft end than it was at the forward end, consistent with the fire spread going from aft to forward. (Tr. 524; PX 74). Likewise, the damage was more severe at the forward end of hold 3 than it was at the aft end. (Tr. 524–25; PX 75).

4. There was more damage on the port side of hold 3 than there was on the starboard side. (Tr. 526; PX 77, 78).

5. There was severe damage in bay 26, and in particular in rows 02, 04, 06. (Tr. 528–29; PX 79). There was a major collapse of the cargo stowed on deck into bay 26. There was severe fire damage in that area, above where the cal-hypo had been stowed. (Tr. 533–34; PX 82, 84, 85). The major damage was found where the cal-hypo was stored. (Tr. 558).

6. The steel had been melted in bay 26 to the point where there was defamation—the steel had been heated so much that it lost its structural strength and bent. In some places the steel had actually burned away, resulting in re-solidified globules of steel. The steel had turned to iron oxide, or rust, and had become very brittle or friable. (Tr. 534–35; PX 84, 85). These characteristics were consistent with the involvement of a large quantity of oxidizers because the extent of the damage suggested an oxygen-rich fire, such as the kind that would result from a cal-hypo fire. (Tr. 534–35). The oxidizer itself does not burn, but when it decomposes it generates oxygen, which will assist in the burning of

surrounding materials. (Tr. 535–37). Here, the surrounding flammable materials included the fiber drums, shrink wrapping, wooden pallets, wooden floors of the containers, the paint on the containers, and, when the fire got hot enough, the steel of the containers itself. (Tr. 536–37). The area where the steel had been burned in this fashion was "quite localized" in bay 26. No other areas with the same type of destruction was found. (Tr. 538).

7. As reflected in the documents, including the dangerous cargo manifest and stowage plan, the only dangerous cargo stored in hold 3 was the cal-hypo in the forward port corner of hold 3. (Tr. 538).

8. The witnesses reported an explosion immediately followed by large quantities of white smoke and then flames. These observations are consistent with a fire involving cal-hypo. (Tr. 539–40). White smoke—or white particulates dispersed in the air—is a feature of a cal-hypo fire. The cargo manifest did not reveal any other materials that would generate very large quantities of white smoke. (Tr. 540–41, 2031–33); see PX 174 (videotape of cal-hypo fire, giving off white smoke); OX 50 (PPG safety video, showing cal-hypo fire giving off white smoke).

9. The pattern of fire damage showed movement and directional damage, indicating that the "seat" of the fire or explosion was on the forward port side of the vessel, where the cal-hypo had been stored. There was a hatch cover collapse on the forward port side, with deck containers having fallen into the hold. In the middle of bay 26, there was a movement of materials in a forward direction. On the starboard side of bay 26, there was directional damage moving out to starboard. In the center of bay 34, there was directional movement aft and outwards, which decreased further aft. The deck cargo above bay 38 was still in place. There was also evidence that the tank had exploded on the port side around bay 30. (Tr. 549–51; PX 93).

10. An inspection of the smoke detection system showed that there had been smoke in all three holds, but the smoke in hold 3 "was by far the worst." (Tr. 543–45). There was some smoke in hold 2 and "a little" in hold 1, but that was more likely than not smoke drawn into those holds from the smoke coming out of hold 3. (Tr. 545; see also Tr.2030–31).

11. There was no evidence to suggest that the fire started on the starboard side; there was evidence inconsistent with the fire starting on the starboard side; and the stowage patterns, fire damage patterns, and witness evidence were all consistent with the fire starting in the forward port side and then spreading both forward and aft from there. (Tr. 556–57).

12. The most severe damage was along the line between bays 25 and 27—the line along the doors of the containers in bay 25. (Tr. 557–58; PX 97, 98). The cal-hypo was stored in these containers. (PX 92, 97, 98). Some of these containers showed deformation bending upwards—a sign of "considerable disruption" of the metal. (Tr. 559; PX 98).

13. Container 250404 was identified, and very little remained. The two doors were missing, as they had been blown off and embedded into the adjacent container, 270404. (Tr. 566, 568–69, 573–74, 2052; PX 103, 104). Imbedded into container 270604 was a door that had been blown off of the adjacent container, 250604. In other words, the force of the explosions in containers 250604 and 250404—both of which contained cal-hypo—blew doors off and embedded them into the adjacent aft containers, 270604 and 270404, respectively. (Tr. 566–67, 575, 581, 641, 2051; PX 96; see also PX 92–A, 94). Containers are

typically stowed with the doors at the aft end. (Tr. 556).

14. The right side of container 250604 was pushed inward, suggesting a force from container 250404. Similarly, container 250804, the outboard container, was deformed and pushed against the side of the bunker tank, again suggesting a force from inside the ship toward the bunker tank. (Tr. 575–76). The containers in tier 02—containers 250802, 250602, and 250402—were collapsed down, almost to the tank level, suggesting a force from above. (Tr. 576). In contrast, doors were still attached to the containers in bay 27 that contained cal-hypo (containers 270802, 270602, 270402)—these doors had not been blown off. (Tr. 582–83; PX 92–A).

15. Container 250802 had been burned badly, as very little of it remained. But when the roof of the container was pulled back, neat stacks of rings were found, indicating that the drums burned in place and the rings fell straight down. (Tr. 583–84; PX 105). In contrast, in container 250404, there was considerable disruption and the rings were not in neat stacks. (Tr. 584–85; PX 103). This would suggest an explosion inside 250404 but not inside 250802.

### 3. What Caused the Fire?

The cause of the fire was thermal runaway in the cal-hypo in container 250404. (Tr. 649–50).

In light of the circumstances in which it was loaded, including the manner in which it was placed while still hot into 136–kilo-gram fiber drums that were then shrink-wrapped onto wooden pallets and tightly packed three-high into unrefrigerated, unventilated metal containers, the cal-hypo on the HARMONY had a CAT of below 41°C. (Tr.2073–74).[28] Here, the temperature in the hold was approximately 40°C and on November 9, 1998 the cal-hypo in container 250404 went into thermal runaway. It was simply less stable than anyone realized. This is the most logical, if not the only logical, explanation, and I find that, more likely than not, this is what happened.

The evidence demonstrates, beyond any reasonable doubt, that the fire started in the cal-hypo containers. All the physical evidence points to that fact. The transportation of cal-hypo in 300–pound drums was a relatively new, and untested, phenomenon. Testing showed that cal-hypo is less stable than had been realized. The May 2001 test run by Touchstone, for example, showed that a container packed with eighty 196–kilogram drums of cal-hypo stacked only two-high starting at a temperature of 25°C (as compared to 120 drums stacked three-high starting at probably a higher temperature) resulted in an accelerating increase in the temperature of the cal-hypo to the point the oven shut itself off automatically for safety reasons—on the verge of thermal runaway. In addition, three of the five tests run by Safety Consulting Engineers in 1999 failed the SADT test, with a fourth test deemed "borderline."

The storage of the containers adjacent to bunker tank 5 contributed only in the

---

28. Dr. Bound testified that he did not find any data from which he could ascertain the SADT or CAT of the "specific material" carried on the HARMONY. (Tr. 620). Data produced after the casualty (from the Touchstone tests) indicated that a "container-load of calcium hypochlorite will self-heat considerably at . . . an ambient temperature of 41.1 degrees centigrade [approximately 106°F]." (Tr. 620–21)

PPG's manager of commercial development for cal-hypo testified that the test results show that the SADT for cal-hypo in a single, 300–pound drum is 47° or 48°C or 116.6° to 118.4°F. (Ferguson Dep. 942–43; cf. Lee Dep. 475 (120° to 125°F)). Of course, the SADT for cal-hypo shipped in 120 300–pound drums packed in an unventilated, unrefrigerated container will be lower.

sense that the temperature in the hold was undoubtedly affected by the heated bunker tanks. The crew's decision, however, to stow the cal-hypo in that location complied fully with the requirements of the Code. Hold 3 was certified for the carriage of 5.1 class cargo. The Code specifically permitted below deck stowage and the only restriction was that the cargo not be exposed to temperatures in excess of 55 C for more than 24 hours. The ambient temperature in the hold never exceeded 55 C, much less for 24 hours.[29] Rather, PPG failed to give proper warnings and instructions on the transporting of cal-hypo.[30] The thermal runaway and explosion on the HARMONY occurred even though the cal-hypo was exposed to normal and expected hold temperatures.

## DISCUSSION and CONCLUSIONS OF LAW

This is essentially a products liability case in the maritime context. In *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Supreme Court held that products liability law is "part of the general maritime law." *Id.* at 865, 106 S.Ct. 2295. It recognized that the "general maritime law is an amalgam of traditional common-law rules, modification of those rules, and newly created rules," drawn from state and federal sources. *Id.* at 864–65, 106 S.Ct. 2295.

Here, plaintiffs proceed on essentially four legal theories: (1) strict liability; (2) failure to warn; (3) negligence; and (4) breach of warranty. I discuss the strict liability claim first. I then discuss the failure to warn and negligence claims together. In light of my conclusions on these claims, I do not reach the breach of warranty claim.

### A. *Strict Liability*

■ Section 4(6) of COGSA provides in pertinent part:

29. Captain Trey's testimony that the HARMONY's carriage of the PPG containers violated the Code because they were stowed next to the fuel bunkers was unconvincing. He was evasive in this respect, and testified in the end that he construed the Code language conservatively and considered a bunker tank a source of heat regardless of whether temperatures in excess of 55°C were encountered for a period of 24 hours. (Tr. 819–23, 859–60). Likewise, Mr. Rousseau's testimony to the same effect is also unconvincing, because he would also ignore the instruction in the Code that says "where temperatures in excess of 55°C for a period of 24 hours or more will be encountered." (CX 2, Part 3 at 5138; *see* Tr. 1036–38). The difficulty with their argument is that the language is there and must be given meaning, and when the drafters of the Code intended a broader instruction, as they did for other products, they simply wrote: "'Away from' sources of heat." (CX 2, Part 3 at 5137). They did not limit the reference to temperatures in excess of 55°C for 24 hours or more. (*See* Tr. at 1040). Moreover, the more logical interpretation of the UN 2880 instruction is that the 55°C refers to the ambient temperature and not the temperature of the source of the heat. In addition, the instructions for UN 1748 also say the CAT "may be as low as 60°C," and there is no comparable statement for UN 2880. (CX 2, Part 3 at 5137, 5138). Hence, there was nothing in the UN 2880 schedule to warn carriers that UN 2880 could have a CAT as low as it actually has. (*See* Tr. 1042–43).

30. Nor am I persuaded that the crew should be faulted for failing to heed the Swedish Club circular. (CX 40). Although the circular alerted club members that there was a serious problem, it was preliminary in nature and extremely vague. It referred only to "certain container ships," did not specify the type and size of the packaging involved in the recent fire, and stated only that "preliminary results of our research suggest" that the CAT was "considerably lower than that previously published" without explaining what "considerably lower" meant. Moreover, surely PPG was aware of the circular or, at minimum, its contents and yet it permitted the cal-hypo to be shipped on the HARMONY in the manner in which it was shipped.

Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation, and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment. . . .

46 U.S.C. § 1304(6).

In *Senator Linie Gmbh & Co. Kg. v. Sunway Line, Inc.*, 291 F.3d 145 (2d Cir. 2002), the Second Circuit held that § 4(6) of COGSA imposes on a shipper of dangerous goods strict liability "for damages resulting directly or indirectly from such shipment when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the danger." *Senator Linie*, 291 F.3d at 168. The court explained its reasoning:

> [W]e conclude today that a strict-liability construction of § 1304(6) will foster fairness and efficiency in the dealings of commercial maritime actors. In contrast to a carrier, which typically is in the position of taking aboard its vessel a large quantity and variety of cargoes, a shipper can be expected to have greater access to and familiarity with goods and their manufacturers before those goods are placed in maritime commerce. If an unwitting party must suffer, it should be the one that is in a better position to ascertain ahead of time the dangerous nature of the shipped goods. That party in many cases will be the shipper.

291 F.3d at 169; *accord East River Steamship Corp.*, 476 U.S. at 866, 106 S.Ct. 2295 (holding that rationale that "strict liability should be imposed on the party best able to protect persons from hazardous equipment" applies to products liability claims in the maritime context).

The cal-hypo here clearly qualified as "[g]oods of an inflammable, explosive, or dangerous nature." 46 U.S.C. § 1304(6). Indeed, cal-hypo is covered by the Code and was treated by all parties as a dangerous and hazardous material. The vessel and cargo interests, however, did not have actual or constructive pre-shipment knowledge of the true nature of the cargo or the full extent of the danger presented. Nor, apparently, did PPG have actual such knowledge. Neither the vessel interests nor PPG knew of the risks presented by cal-hypo when it is stowed below deck in shrink-wrapped 300–pound fiber drums packed 120 to a container, in normal and expected hold temperatures.

As between plaintiffs and PPG, clearly PPG was in a better position to ascertain ahead of time the true nature of the shipped goods. Indeed, the rationale for applying strict liability is even more compelling here than in *Senator Linie* because PPG was not just the shipper but also the manufacturer.

PPG makes three arguments that warrant some discussion. First, PPG argues that the vessel and cargo interests cannot rely on § 1304(6) because PPG was in privity only with Cho Yang, and the Cho Yang bill of lading extends no rights under COGSA to any other party. Second, PPG argues that *Senator Linie* is inapplicable because Cho Yang and the vessel interests consented to carrying the cal-hypo with knowledge of the nature and characteristics of the product and the hazards presented. Third, PPG argues that § 1304(6) liability is precluded here because Cho Yang and the vessel interests failed to exercise due diligence to render the vessel seaworthy. I address each argument in turn.

PPG's first argument reads § 1304(6) too narrowly. The statute provides that in the circumstances described a shipper is liable for *"all* damages and expenses *directly or indirectly* arising out of or resulting from ... [the] shipment" of the dangerous cargo. 46 U.S.C. § 1304(6) (emphasis added). Congress did not limit liability under the section to any particular class of entities, nor did Congress impose a requirement of privity. It would make no sense to read § 1304(6) to protect only the issuer of the bill of lading, as often such an issuer, like Cho Yang, merely charters space on a ship with no physical property interest at stake. It is the vessel and cargo owners whose property is damaged or destroyed who require protection. *See also Senator Linie*, 291 F.3d at 169 ("In determining that § 1304(6)'s strict-liability rule displaces otherwise inconsistent general maritime law, we have been mindful of COGSA's overarching purpose to 'allocat[e] risk of loss and creat[e] predictable liability rules on which not only carriers but others can rely.' ") (quoting *Stolt Tank Containers v. Evergreen Marine Corp.*, 962 F.2d 276, 279 (2d Cir. 1992)); 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5–6 at 210 (4th ed. 2004) ("In the case of tort liability, ... privity is irrelevant and the doctrine of foreseeability is an inadequate brake. A manufacturer's duty is to the public generally....").[31]

PPG's second argument is rejected because the vessel interests' consent to carrying the cal-hypo was given without knowledge of the full risks and dangers presented by the transporting of cal-hypo in 300–pound drums in the manner in which they were carried aboard the HARMONY. The vessel interests were not properly warned of the extent of the hazards presented. They consented, but their consent was not informed.

PPG's third argument also fails, for, as I have found, the crew of the HARMONY stowed the cal-hypo in full compliance with the Code. They followed the instructions fully, they did not fail to use due diligence, and the ship was not rendered unseaworthy.[32]

Accordingly, judgment will be entered in favor of plaintiffs—both vessel and cargo interests—on their strict liability claim against PPG.

### B. *Failure To Warn and Negligence*

Even assuming the strict liability claim fails, plaintiffs may still prevail by establishing their claims for failure to warn and

---

**31.** PPG relies on cases involving Himalaya clauses, which seek to extend the defenses provided to a carrier under COGSA to an agent of the carrier. *See, e.g., Norfolk So. Ry. Co. v. Kirby*, 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004); *Mikinberg v. Baltic Steamship Co.*, 988 F.2d 327 (2d Cir.1993). These cases are inapplicable, for the issue is not whether the vessel interests may take advantage of limitations on their liability, but whether they may recover for their damages caused by the shipment of dangerous cargo as set forth in § 1304(6). Moreover, while PPG relies on clause 5 of the Cho Yang bill of lading, which addresses "Certain Rights and Immunities for the Carrier and Other Persons," it omits mention of clause 6(1), the "Clause Paramount," which incorporates COGSA in its entirety as a term of the contract. (CX 4 at 2). *See, e.g., Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99, 101–02 (2d Cir.1999).

**32.** *See* COGSA § 4(1), 46 U.S.C. § 1304(1) ("Neither the carrier nor the ship shall be liable for loss or damage arising from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation....").

negligence by showing fault on the part of PPG.

■ A leading admiralty treatise summarizes the substantive law of negligence in this context as follows:

> [T]he plaintiff [is required] to prove: (1) that the defendant sold or manufactured the product; (2) that the product was unreasonably dangerous or was in a defective condition when it left the defendant's control; and (3) that the defect resulted in injury to the plaintiff.

Schoenbaum, *supra*, at 206 (citing Restatement (Second) of Torts § 402A (1965)); *see Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) ("The first principle is that tort law in this area ordinarily (but with exceptions) permits recovery from a manufacturer and others in the initial chain of distribution for foreseeable *physical* harm to property caused by property defects.") (discussing *East River* and citing Restatement (Second) of Torts § 402A (1965)); *see also* 46 U.S.C. § 1304(3) ("The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising from or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants.").

■ Liability is imposed upon sellers and manufacturers who negligently fail to warn of a defect in design or construction, where the existence of the defect is known or should be known, and the manufacturer or seller, by exercising reasonable diligence, could have made a warning available. *See* Schoenbaum, *supra*, at 207; *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984) ("[A] manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold."). A product is deemed defective and unreasonably dangerous even if there is no manufacturing or design defect if the seller or manufacturer fails to give an adequate warning as to foreseeable risks. *See Pavlides*, 727 F.2d at 338. A product is "unreasonably dangerous if the risks inherent in the product are greater than those a reasonable buyer would expect, and the likelihood and gravity of harm outweigh the potential utility of the product." Schoenbaum, *supra*, at 206; *see Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 904 (5th Cir.1982) (holding that manufacturer had duty to warn stevedore and vessel of "foreseeable hazards inherent in the [cal-hypo] shipment of which the stevedore and the ship's master could not reasonably have expected to be aware").

■ The adequacy of a warning depends on its reasonableness in view of the danger created. Schoenbaum, *supra*, at 207. "In assessing what hazards are foreseeable, a manufacturer is held to the status of an expert." *Pavlides*, 727 F.2d at 338. There is no duty, however, to warn a person who has actual knowledge of the danger. Schoenbaum, *supra*, at 207–08. The manufacturer must show that the injured party "had knowledge of the specific hazard and of the extent of harm that could follow, so that his choice to brave it was an informed one." *Pavlides*, 727 F.2d at 340.

■ Here, I conclude that plaintiffs have proven their failure to warn and negligence claims. First, it is undisputed that PPG manufactured and shipped the product. Second, the product was unreasonably dangerous when it left PPG's control and PPG failed to give adequate warnings on the handling and transportation of the product. Third, plaintiffs' property was damaged as a result.

Although I have concluded that PPG was not actually aware of the full risks of shipping cal-hypo in 300–pound drums in the manner in which it was shipped here, I conclude also that the hazard was foreseeable, as there were sufficient red flags to have caused PPG, in the exercise of reasonable care, to have investigated further the dangers presented.

PPG knew that cal-hypo was a hazardous, unstable product that decomposes upon exposure to heat, with a risk of thermal runaway. PPG knew that the manner in which cal-hypo was stored and packed for shipping was important to the risk of accelerating decomposition. PPG knew that a large quantity of cal-hypo was being shipped here—ten containers holding 120 300–pound drums each—and it knew that the risk of accelerating decomposition increased as the mass of cal-hypo increased. PPG knew that the metal containers used for this type of transportation were not ventilated or refrigerated and would be exposed to some sunlight and the temperatures in the hold of a container ship. PPG knew of prior fires and explosions involving PPG, including the fire on the M/V CONTSHIP FRANCE in October 1997. PPG knew or should have known of the research referred to in the Swedish Club circular, which suggested that the CAT of cal-hypo was "considerably lower" than had been previously published. All of these red flags should have caused PPG to investigate further the risks of transporting cal-hypo in 300–pound fiber drums in unventilated, unrefrigerated metal containers, packed 120 drums per container, in the temperatures typically found in the hold of a container ship.

The reasonableness of PPG's actions must be measured by the danger presented, and here the risks were great. A shipment of ten containers each packed with 120 300–pound drums of an unstable substance presented significant risks, and, indeed, there was a huge fire that resulted in the loss of an entire container ship as well as hundreds of containers of cargo. In view of the magnitude of the risks presented, a reasonable manufacturer would have done more than PPG did here. The tests that were done in 1999 and 2001, for example, should have been done immediately after the CONTSHIP FRANCE fire, if not before. In addition, tests such as these should have been performed before PPG started shipping cal-hypo in 300–pound drums packed 120 per container. The 300–pound fiber drums had only been in use for a period of months before the fire on the HARMONY, and PPG had done no testing on them.

The warnings provided by PPG were inadequate and misleading. The Material Safety Data Sheet, for example, warned only that cal-hypo decomposes at 180°C (356°F) and is unstable above 117°C (253°F). (CX 184 at 5407, 5409). This sheet was prepared by PPG, and, of course, cal-hypo decomposes and is unstable at much lower temperatures. In contrast, in the domestic transportation of one-ton bags of cal-hypo by truck, PPG used refrigerated containers set to temperatures of 70° to 80°F (approximately 21° to 27° C), far lower than the ambient temperatures usually found in the holds of ships (approximately 35° to 40°C (or 95° to 104°F) in the hold of the HARMONY). PPG also believed that cal-hypo should be stored in warehouses at a temperature of below 90°F (approximately 32°C), again below the temperature usually found in ship holds.

Likewise, PPG signed dock receipts certifying that the containers had been packed in accordance with regulations and that the materials were "properly classified, described, marked, labeled, and are in proper condition for transportation, according to applicable regulations of the [DOT]." (CX 6). PPG should have known

that the provisions of the Code applicable to UN 2880 were inadequate, as the Code provided only that UN 2880 is to be stored away from sources of heat "where temperatures in excess of 55°C for a period of 24 hours or more will be encountered." (CX 2, Part 3 at 5138). In fact, at least where it is shipped in 300–pound drums packed 120 to a container, UN 2880 should be stowed at temperatures substantially lower than 55°C. Moreover, although it concluded that the CONTSHIP FRANCE fire had been caused by stowage of cal-hypo next to heated bunker tanks, PPG took no steps to warn other shippers of this risk.

PPG had a duty to provide a warning that would fully inform vessels and others in the distribution chain of all the risks involved in shipping cal-hypo in the manner in which it was shipped here. PPG breached that duty. The court's observation in *Pavlides* is applicable here:

> Holding [the manufacturer] to the legally mandated standard of expertness, we find that the manufacturer should reasonably have foreseen that a disaster like that which happened here could occur if warnings adequate to inform an ordinary person of the specific dangers were not given. Consequently, it had a commensurate duty to provide such a warning.

727 F.2d at 339.

### CONCLUSION

For the reasons stated above, the Court concludes that PPG is liable to the vessel and cargo interests on their strict liability, negligence, and failure-to-warn claims. Counsel for the parties shall appear for a conference on November 1, 2005, at 10 a.m. to discuss further proceedings.

SO ORDERED.